UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH DIVISION

| | |
|---|---|
| GEORGE BOLYARD, Individually and for Others Similarly Situated<br><br>v.<br><br>GMS MINE REPAIR AND MAINTENANCE, INC. | **Case No.** _____<br><br>Jury Trial Demanded<br><br>FLSA Collective Action<br>Rule 23 Class Action |

## ORIGINAL CLASS AND COLLECTIVE ACTION COMPLAINT

### SUMMARY

1.      Goerge Bolyard (Bolyard) brings this class and collective action to recover unpaid wages and other damages from GMS Mine Repair and Maintenance, Inc. (GMS) for violations of the Fair Labor Standards Act (FLSA), the Pennsylvania Minimum Wage Act (PMWA), and Pennsylvania Wage Payment and Collection Law (WPCL).

2.      GMS employed Bolyard as one of its Miners (defined below) in Greene County, Pennsylvania.

3.      GMS pays Bolyard and its other Miners on an hourly basis.

4.      Bolyard and the other Miners regularly work more than 40 hours a workweek.

5.      But GMS does not pay Bolyard and its other Miners for all their hours worked, including overtime hours.

6.      Instead, GMS requires Bolyard and its other Miners to gather tools and equipment necessary to perform their job duties, while on GMS's and its client's premises, suit out in protective clothing and safety gear necessary to safely perform their job duties, while on GMS's and its client's

1

premises, walk to the mine entrance, and be ready to work at the mine entrance at least 15 minutes prior to the start of their scheduled shifts.

7.    Likewise, GMS requires Bolyard and its other Miners to exit the mine, walk to their changing facility, wash-up, change out of their safety gear and protective clothing, and store their tools and equipment after the end of their scheduled shifts, on GMS's and its client's premises (¶¶ 6-7 together, GMS's pre/post shift off the clock policy).

8.    But GMS does not pay Bolyard and its other Miners for the time they spend donning and doffing their safety gear and protective clothing, gathering and storing their tools and equipment, and washing-up "off the clock" before and after their scheduled shifts.

9.    GMS's uniform pre/post shift off the clock policy violates the FLSA and PMWA by depriving Bolyard and the other Miners of overtime wages for all overtime hours worked.

10.    Likewise, GMS's uniform pre/post shift off the clock policy violates the WPCL by depriving Bolyard and the other Miners of earned wages for all hours worked on their regular paydays and/or following the termination of their employment.

## JURISDICTION & VENUE

11.    This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this case involves a federal question under the FLSA, 29 U.S.C. § 216(b).

12.    This Court has supplemental jurisdiction of the state-law subclass claims because they arise from a common nucleus of operative facts. 28 U.S.C. § 1367.

13.    This Court has general personal jurisdiction over GMS because GMS is registered to do business in the Commonwealth. *See Mallory v. Norfolk Southern Railway Co.*, 600 U.S. 122, 134 (2023); *see also* 42 PA. CONS. STAT. § 5301.

14.    Venue is proper because a substantial portion of the events or omissions giving rise to this action occurred in this District and Division. 28 U.S.C. § 1391(b)(2).

15.    Specifically, GMS employed Bolyard and failed to pay him for all hours worked, including overtime hours, in Greene County, Pennsylvania, which is in this District and Division.

**PARTIES**

16.    Bolyard worked for GMS as a Coal Miner in Greene County, Pennsylvania from approximately August 2021 through January 2022.

17.    GMS assigned Bolyard to provide services to GMS's client, Consol Energy, in the Bailey Coal Mine.

18.    Throughout his employment, GMS classified Bolyard as non-exempt and paid him on an hourly basis.

19.    Throughout his employment, GMS subjected Bolyard to its uniform, illegal pre/post shift off the clock policy.

20.    Bolyard's written consent is attached as **Exhibit 1**.

21.    Bolyard brings this class and collective action on behalf of himself and other similarly situated GMS employees who were subject to GMS's uniform, illegal pre/post shift off the clock policy.

22.    GMS uniformly prohibits these employees from recording their hours worked on GMS and its client's premises donning and doffing their safety gear and protective clothing, gathering and storing their tools and equipment, and washing-up before and after their scheduled shifts.

23.    Each of these employees are regularly forced to work "off the clock" and without compensation, on GMS and its client's premises, donning/doffing their safety gear and protective

clothing, gathering and storing their tools and equipment, and washing-up before and after their scheduled shifts.

24.     Thus, GMS uniformly deprives these employees of overtime wages for all overtime hours worked in violation of the FLSA and PMWA.

25.     The FLSA collective of similarly situated employees under the KWHA is defined as:

> **All hourly GMS employees who were subject to GMS's pre/post shift off the clock policy at any time during the past 3 years until final resolution of this Action (the "FLSA Collective Members").**

26.     Bolyard also seeks to represent a class under the PMWA and WPCL pursuant to FED. R. CIV. P. 23.

27.     The Pennsylvania Class of similarly situated employees is defined as:

> **All hourly GMS employees in, or based out of, Pennsylvania[1] who were subject to GMS's pre/post shift off the clock policy at any time during the past 3 years until final resolution of this Action (the "Pennsylvania Class Members").**

28.     GMS is a Maryland corporation headquartered in Oakland, Maryland.

29.     GMS is registered to do business in the Commonwealth.

---

[1] The PMWA and WPCL apply to Pennsylvania workers, regardless of the state in which the work is performed. *Truman v. DeWolff, Boberg & Assocs., Inc.*, No. 07-01702, 2009 WL 2015126, at *2 (W.D. Pa. July 7, 2009) ("In light of the FLSA's explicit recognition that states may offer greater protections to its employees than the FLSA, we are reluctant to find an unstated foreign-work exemption in the PMWA based solely on the fact that the FLSA contains such an exemption."). Courts apply a five-factor test for purposes of the PMWA and WPCL to determine whether workers are based in Pennsylvania, which include (1) employer's headquarters; (2) employee's physical presence working in Pennsylvania; (3) extent of employee's contact with Pennsylvania Employer, i.e., reporting, direction, supervision, hiring, assignment, and termination; (4) employee's residence; and (5) employee's ability to bring her claim in another forum. *See Matthews v. BioTelemetry, Inc.*, No. 18-561, 2018 WL 3648228, at *3 (E.D. Pa. July 31, 2018).

30.     GMS may be served with process by serving its officers, directors, managing agents, or general agents at its registered address: **112 Columbia Drive, Waynesburg, PA 15370**.

### FLSA COVERAGE

31.     At all relevant times, GMS has been an "employer" within the meaning of Section 3(d) of the FLSA, 29 U.S.C. § 203(d).

32.     At all relevant times, GMS has been an "enterprise" within the meaning of Section 3(r) of the FLSA, 29 U.S.C. § 203(r).

33.     At all relevant times, GMS has been an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of Section 3(s)(1) of the FLSA, 29 U.S.C. § 203(s)(1), because it had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials—such as cell phones, computers, tools, PPE, pens, paper, etc.—that have been moved in or produced for commerce.

34.     At all relevant times, GMS has had an annual gross volume of sales made or business done of $1,000,000 each year.

35.     At all relevant times, Bolyard and the other Miners have been GMS's "employees" within the meaning of Section 3(e) of the FLSA, 29 U.S.C. § 203(e).

36.     At all relevant times, Bolyard and the other Miners have been engaged in commerce or in the production of goods for commerce.

37.     GMS uniformly subjects Bolyard and its other Miners according to its illegal pre/post shift off the clock policy.

38.     GMS applied its illegal pre/post shift off the clock policy to its Miners regardless of any alleged individualized factors, such as specific job title or geographic location.

39.     By subjecting Bolyard and its other Miners to its pre/post shift off the clock policy, GMS did not pay them overtime when they worked more than 40 hours in a workweek.

40.     GMS's uniform pre/post shift off the clock policy therefore violates the FLSA. 29 U.S.C. § 207(a) & (e).

## FACTS

41.     GMS has "been serving the Mining Industry for nearly 40 years" and "offers Underground and Surface Mining contract labor and services."[2]

42.     To meet its business objectives, GMS hires workers, like Bolyard and the other Miners, who it "staffs" to its clients, including in Pennsylvania.

43.     GMS uniformly classifies these employees as non-exempt and pays them on an hourly basis.

44.     While exact job titles and precise job duties may differ, Bolyard and the other Miners are all subject to GMS's same or similar illegal policy – its illegal pre/post shift off the clock policy – while performing the same or similar work.

45.     For example, Bolyard worked for GMS as a Coal Miner assigned to provide services to GMS's client, Consol Energy, in Greene County, Pennsylvania from approximately August 2021 through January 2022.

46.     As a Coal Miner, Bolyard's job duties included working in GMS's client's (Consol Energy's) underground coal mine, primarily repairing and maintaining continuous miner belts and related equipment in the mine.

---

[2] https://www.gmsminerepair.com/ (last visited June 4, 2024).

47.    Bolyard's job duties likewise included donning and doffing his safety gear and protective clothing, gathering and storing their tools and equipment, and washing-up, before and after his scheduled shifts on GMS and its client's premises.

48.    Throughout his employment, GMS classified Bolyard as non-exempt and paid him on an hourly basis.

49.    Indeed, GMS agreed to pay Bolyard approximately $21.50 an hour for his first 40 hours worked plus overtime for his hours worked in excess of 40 in a workweek.

50.    Throughout his employment, GMS required Bolyard's "on the clock" hours worked to be reported to GMS through a paper timesheet possessed and filled out by his crew leader, not Bolyard.

51.    Throughout his employment, Bolyard typically worked 9-10+ hours a day for 7 days a workweek (63 to 80+ hours a workweek).

52.    GMS scheduled Bolyard to work rotating 8-hour shifts, which resulted in him working 8 shifts in 7 days during some workweeks.

53.    But throughout his employment, GMS did not pay Bolyard for all his hours worked.

54.    Instead, throughout his employment, GMS subjected Bolyard to its uniform, illegal pre/post shift off the clock policy.

55.    Specifically, GMS required Bolyard to dress out in his protective clothing and safety gear (including hard hat, headlight, reflective shirt and pants, respirator, self-contained self-rescuer (SCSR), inspect the SCSR each day, radio, metatarsal boots, gas detector, kneepads, safety glasses, and tool pouch), gather tools and equipment (including channel lock pliers, hammers, sledge hammers, saws, knives, and hardware) fundamentally necessary to performing his job as a Coal Miner, walk to

the mine entrance, and to be ready to work at the mine entrance 15 minutes prior to his scheduled shift, all "off the clock," without compensation.

56.     This took Bolyard approximately 1 hour each workday.

57.     Bolyard could not perform his job duties as a Coal Miner in accordance with GMS's (and its client's) policies, procedures, and expectations without this protective clothing, safety gear, tools, and equipment.

58.     Bolyard could not safely perform his job duties as a Coal Miner in accordance with GMS's (and its client's) policies, procedures, and expectations without this protective clothing, safety gear, tools, and equipment.

59.     Indeed, much of the safety gear Bolyard must utilize, including the SCSR and gas detector, is mandated by federal regulation. *See* 30 C.F.R. § 75.1, *et seq*; *see also* 29 C.F.R. § 1910.132(a).

60.     The donning of protective clothing and safety gear and gathering of tools and equipment are therefore integral and indispensable work duties for Bolyard.

61.     Likewise, GMS required Bolyard to remove his safety gear and protective clothing, store his tools and equipment, and wash up each day after his scheduled shift, all "off the clock."

62.     This took Bolyard approximately 30 minutes each workday.

63.     Bolyard could not perform his job duties as a Coal Miner in accordance with GMS's (and its client's) policies, procedures, and expectations without removing his safety gear and protective clothing, storing his tools and equipment, and washing up each day.

64.     Bolyard could not safely perform his job duties as a Coal Miner in accordance with GMS's (and its client's) policies, procedures, and expectations without removing his safety gear and protective clothing, storing his tools and equipment, and washing up each day.

8

65.     The removal of his safety gear and protective clothing, storing his tools and equipment, and washing up each day are therefore integral and indispensable work duties for Bolyard.

66.     But under its pre/post shift off the clock policy, GMS did not compensate Bolyard for the same.

67.     Thus, as a result of its illegal pre/post shift off the clock policy, GMS failed to pay Bolyard overtime wages for all his overtime hours worked in violation of the FLSA and PMWA.

68.     And GMS failed to pay Bolyard all his earned wages on his scheduled paydays and/or upon termination of employment in violation of the WPCL.

69.     Bolyard and the other Miners perform their jobs under GMS's supervision and use materials, equipment, and technology GMS approves and supplies.

70.     GMS requires Bolyard and its other Miners to follow and abide by common work, time, pay, and overtime policies and procedures in the performance of their jobs.

71.     At the end of each pay period, Bolyard and the other Miners receive wages from GMS that are determined by common systems and methods that GMS selects and controls.

72.     GMS requires Bolyard and its other Miners to submit their "on the clock" hours worked, as recorded by their crew leader, to GMS for approval via weekly timesheets.

73.     But, just as with Bolyard, GMS fails to pay its other Miners for all their hours worked.

74.     Indeed, GMS uniformly subjects its other Miners to the same or similar illegal pre/post shift off the clock policy it imposed on Bolyard.

75.     Specifically, just as with Bolyard, GMS requires them to dress out in their protective clothing and safety gear (including hard hat, headlight, reflective shirt and pants, respirator, SCSR, inspect the SCSR each day, radio, metatarsal boots, gas detector, kneepads, safety glasses, and tool pouch), gather tools and equipment (including channel lock pliers, hammers, sledge hammers, saws,

and knives) fundamentally necessary to performing their jobs as coal miners, walk to the mine entrance, and be ready to work at the mine entrance 15 minutes prior to their scheduled shifts, all "off the clock."

76.     And GMS requires them to exit the mine, walk to the changing facility, remove their safety gear and protective clothing, store their tools and equipment, and wash up each day after their scheduled shifts, all "off the clock."

77.     And like Bolyard, much of the safety gear they must utilize, including the SCSR and gas detector, is mandated by federal regulation. *See* 30 C.F.R. § 75.1, *et seq*; *see also* 29 C.F.R. § 1910.132(a).

78.     But, like Bolyard, the other Miners are regularly forced to perform this compensable work "off the clock" before and/or after their scheduled shifts for GMS's predominant benefit.

79.     And, just as with Bolyard, GMS does not pay its other Miners for this work they perform "off the clock."

80.     And, just as with Bolyard, these job duties take the other Miners approximately 1.5 hours to complete each workday.

81.     GMS fails to exercise its duty as Bolyard's and the other Miners' employer to ensure these employees are not performing work "off the clock" on its and its client's premises that GMS does not want performed.

82.     And GMS knows, should know, or recklessly disregards whether Bolyard and its other Miners routinely perform work "off the clock," and without compensation, before and after their scheduled shifts.

83.    Indeed, Bolyard and other Miners complained to their supervisors, HR, and/or GMS management about being forced to work "off the clock" before and after their scheduled shifts without pay on a regular basis.

84.    Thus, GMS requests, suffers, permits, or allows Bolyard and its other Miners to work "off the clock," without compensation, before and after their scheduled shifts.

85.    Despite accepting the benefits, GMS does not pay Bolyard and its other Miners for the compensable work they perform "off the clock" before and after their scheduled shifts.

86.    Thus, under GMS's uniform, illegal pre/post shift off the clock policy, Bolyard and the other Miners are denied overtime pay for the compensable work they perform "off the clock" before and after their scheduled shifts during workweeks in which they work more than 40 hours in violation of the FLSA and PMWA.

87.    And under GMS's uniform, illegal pre/post shift off the clock policy, Bolyard and the other Miners are denied earned wages under the WPCL.

### CLASS & COLLECTIVE ACTION ALLEGATIONS

88.    Bolyard incorporates all other paragraphs by reference.

89.    Bolyard brings his claims as a class and collective action under Section 216(b) of the FLSA and Fed. R. Civ. P. 23.

90.    Like Bolyard, the other Miners are victimized by GMS's illegal pre/post shift off the clock policy.

91.    Other Miners worked with Bolyard and indicated they were paid in the same manner, performed similar work, and were subject to GMS's same illegal pre/post shift off the clock policy.

92.    Based on his experience with GMS, Bolyard is aware GMS's illegal pre/post shift off the clock policy was imposed on the other Miners.

93.     The Miners are similarly situated in the most relevant respects.

94.     Even if their precise job duties and locations might vary, these differences do not matter for the purposes of determining their entitlement to overtime.

95.     Rather, the Putative Classes are held together by GMS's pre/post shift off the clock policy, which systematically deprived Bolyard and the Miners of proper wages, including required overtime wages, for all hours worked, including those in excess of 40 hours in a workweek.

96.     Therefore, the specific job titles or precise job locations of the various Miners do not prevent class or collective treatment.

97.     GMS's failure to pay these employees "straight time" and overtime wages at the rates required by the FLSA, PMWA, and/or WPCL results from generally applicable, systematic policies, and practices which are not dependent on the personal circumstances of the Miners.

98.     The Pennsylvania Class Members are similarly denied "straight time" wages (at their agreed hourly rates) for all hours worked when they work fewer than 40 hours in a workweek.

99.     The Miners are similarly denied overtime wages at the required premium rate for all overtime hours worked when they work more than 40 hours in a workweek.

100.    The back wages owed to Bolyard and the other Miners can therefore be calculated using the same formula applied to the same records.

101.    Even if the issue of damages were somewhat individual in character, the damages can be calculated by reference to GMS's records, and there is no detraction from the common nucleus of liability facts.

102.    Therefore, the issue of damages does not preclude class or collective treatment.

103.    Bolyard's experiences are therefore typical of the experiences of the other Miners.

104.    Bolyard has no interest contrary to, or in conflict with, the other Miners that would prevent class or collective treatment.

105.    Like each Miner, Bolyard has an interest in obtaining the unpaid wages owed under federal and Pennsylvania law.

106.    A class and collective action is superior to other available means for fair and efficient adjudication of this lawsuit.

107.    Absent this class and collective action, many Miners will not obtain redress for their injuries, and GMS will reap the unjust benefits of violating the FLSA and Pennsylvania law.

108.    Further, even if some of the Miners could afford individual litigation, it would be unduly burdensome to the judicial system.

109.    Indeed, the multiplicity of actions would create a hardship to the Miners, the Court, and GMS.

110.    Conversely, concentrating the litigation in one forum will promote judicial economy and consistency, as well as parity among the Miners' claims.

111.    The questions of law and fact that are common to each Miner predominate over any questions affecting solely the individual members.

112.    Among the common questions of law and fact are:

    a.    Whether GMS's pre/post shift off the clock policy failed to compensate the Miners for all hours worked.

    b.    Whether GMS's pre/post shift off the clock policy deprived the Miners of overtime when they worked more than 40 hours in a week in violation of the FLSA and PMWA;

    c.      Whether GMS's pre/post shift off the clock policy deprived the Miners of earned wages on their regular paydays and/or following the termination of their employment in violation of the WPCL;

    d.      Whether GMS's decision not to pay its Miners all overtime due was made in good faith;

    e.      Whether GMS's failure to pay its Miners earned wages was the result of a *bona fide* dispute; and

    f.      Whether GMS's FLSA violations were willful.

113.    Bolyard knows of no difficulty that will be encountered in the management of this litigation that would preclude its ability to go forward as a class or collective action.

114.    GMS's pre/post shift off the clock policy deprived Bolyard and the other Miners of the overtime wages they are owed under federal and Pennsylvania law.

115.    There are many similarly situated Miners who have been denied overtime pay in violation of the FLSA who would benefit from the issuance of a court-supervised notice of this lawsuit and the opportunity to join it.

116.    The Miners are known to GMS and can be readily identified and located through GMS's business and personnel records.

**GMS'S FAILURE TO PAY WAGES WAS
UNREASONABLE & NOT THE RESULT OF A *BONA FIDE* DISPUTE**

117.    Bolyard incorporates all other paragraphs by reference.

118.    GMS knew it was subject to the PMWA's overtime provisions.

119.    GMS knew the PMWA required it to pay non-exempt employees, including its Miners, overtime at rates not less than 1.5 times their regular rates of pay for all hours worked after 40 in a week.

120.    GMS knew it was subject to the WPCL.

121.    GMS knew the WPCL required it to pay employees, including its Miners, all wages (including overtime) earned on their regular paydays and following the termination of their employment.

122.    GMS knew each Miner worked more than 40 hours in at least one workweek during the last 3 years.

123.    GMS knew its Miners were non-exempt employees entitled to overtime pay.

124.    GMS knew the Miners were its hourly employees.

125.    GMS knew it paid its Miners on an hourly basis.

126.    GMS knew the PMWA and WPCL required it to pay employees, including its Miners, for all hours they performed compensable work.

127.    GMS knew it had a duty to ensure its Miners were not performing work "off the clock" (without pay).

128.    GMS knew it required its Miners to don and doff safety gear and protective clothing, gather and store tools and equipment, and wash-up "off the clock."

129.    GMS controlled its Miners' "off the clock" procedures.

130.    GMS knew its Miners' mandatory "off the clock" work was a fundamental requirement of their jobs with GMS.

131.    GMS knew its Miners' mandatory "off the clock" work was an integral and indispensable requirement of their jobs with GMS.

132.    GMS knew its Miners routinely performed this daily, required "off the clock" work for GMS's benefit.

133.    In other words, GMS knew its Miners performed compensable work (*e.g.*, donning/doffing their safety gear and protective clothing, gathering and storing tools and equipment, and washing-up) "off the clock."

134.    GMS knew it was required to pay its Miners for all their hours worked, including those worked "off the clock" while donning and doffing their safety gear and protective clothing, gathering and storing tools and equipment, and washing-up in accordance with GMS's policies and procedures.

135.    Nonetheless, GMS did not pay its Miners for the required "off the clock" work they performed.

136.    GMS knew it was required to pay its Miners overtime wages for all overtime hours worked, including those worked "off the clock," under the PMWA.

137.    Nonetheless, GMS did not pay its Miners overtime wages for all overtime hours worked, including those worked "off the clock."

138.    Likewise, GMS knew there was no reasonable dispute with respect to whether its Miners were entitled to be paid for their hours worked "off the clock"—they were entitled to be paid for those hours.

139.    Nonetheless, GMS failed to pay its Miners all their wages on their regular paydays and/or following the termination of their employment.

140.    GMS's refusal to pay its Miners for the time they spent donning/doffing their safety gear and protective clothing, gathering and storing their equipment and tools, and washing-up "off the clock" was unreasonable.

141.    GMS's refusal to pay its Miners overtime wages for all overtime hours worked was unreasonable.

142.    GMS's refusal to pay its Miners earned wages for all hours worked on their regular paydays and following the termination of their employment was unreasonable.

143.    GMS's failure to pay its Miners their proper earned wages was not the result of a *bona fide* dispute.

144.    GMS knew its conduct violated the PMWA and WPCL.

### GMS's FLSA VIOLATIONS WERE WILLFUL AND/OR DONE IN RECKLESS DISREGARD OF THE FLSA

145.    Bolyard incorporates all other paragraphs by reference.

146.    GMS knew it was subject to the FLSA's overtime provisions.

147.    GMS knew the FLSA required it to pay non-exempt employees, including the Miners, overtime at rates not less than 1.5 times their regular rates of pay for all hours worked after 40 in a workweek.

148.    GMS knew each Miner worked more than 40 hours in at least one workweek during the relevant period.

149.    GMS knew it paid its Miners according to its pre/post shift off the clock policy.

150.    GMS knew it had a duty to ensure its Miners were not performing work "off the clock" (without pay).

151.    GMS knew it required its Miners to don and doff safety gear and protective clothing, gather and store tools and equipment, and wash-up "off the clock."

152.    GMS controlled its Miners' "off the clock" procedures.

153.    GMS knew its Miners' mandatory "off the clock" work was a fundamental requirement of their jobs with GMS.

154.    GMS knew its Miners' mandatory "off the clock" work was an integral and indispensable requirement of their jobs with GMS.

155.    GMS knew its Miners routinely performed this daily, required "off the clock" work for GMS's benefit.

156.    In other words, GMS knew its Miners performed compensable work (*e.g.*, donning/doffing their safety gear and protective clothing, gathering and storing tools and equipment, and washing-up) "off the clock."

157.    GMS knew its pre/post shift off the clock policy failed to compensate the Miners for all hours worked, including overtime hours.

158.    GMS knew, should have known, or showed reckless disregard for whether its conduct described in this Complaint violated the FLSA.

159.    GMS knowingly, willfully, and/or in reckless disregard carried out its illegal pre/post shift off the clock policy that systematically deprived the Miners of overtime for their hours worked over 40 in a workweek in violation of the FLSA.

## GMS'S FLSA VIOLATIONS WERE NOT DONE IN GOOD FAITH

160.    Bolyard incorporates all other paragraphs by reference.

161.    GMS did not seek the advice of counsel regarding its pre/post shift off the clock policy.

162.    GMS did not receive advice from counsel regarding its pre/post shift off the clock policy.

163.    GMS did not rely on the advice of counsel in deciding to implement its pre/post shift off the clock policy.

164.    GMS did not investigate whether its pre/post shift off the clock policy compensated its Miners for all hours worked.

165.    GMS's decision not to pay its Miners overtime was neither reasonable nor made in good faith.

**COUNT I**
**FAILURE TO PAY OVERTIME WAGES UNDER THE FLSA**
**(FLSA COLLECTIVE)**

166.    Bolyard incorporates all other paragraphs by reference.

167.    Bolyard brings his FLSA claim as a collective action on behalf of himself and the other FLSA Collective Members pursuant to 29 U.S.C. § 216(b).

168.    GMS violated, and is violating, the FLSA by employing non-exempt employees (Bolyard and the other FLSA Collective Members) in a covered enterprise for workweeks in excess of 40 hours without paying such employees overtime wages at rates not less than 1.5 times their regular rates of pay for the hours they worked in excess of 40 in a workweek.

169.    GMS's unlawful conduct harmed Bolyard and the other FLSA Collective Members by depriving them of the overtime wages they are owed.

170.    Accordingly, GMS owes Bolyard and the other FLSA Collective Members the difference between the rate actually paid and the proper overtime rate.

171.    Because GMS knew, or showed reckless disregard for whether, its pre/post shift off the clock policy violated the FLSA, GMS owes Bolyard and the other FLSA Collective Members these wages for at least the past 3 years.

172.    GMS is also liable to Lagard and the other FLSA Collective Members for an amount equal to all their unpaid wages as liquidated damages.

173.    Finally, Lagard and the other FLSA Collective Members are entitled to recover all reasonable attorney's fees and costs incurred in this action.

**COUNT II**
**FAILURE TO PAY OVERTIME WAGES UNDER THE PMWA**

(PENNSYLVANIA CLASS)

174.    Bolyard incorporates all other paragraphs by reference.

175.    Bolyard brings his PMWA claim as a class action on behalf of himself and the other Pennsylvania Class Members pursuant to FED. R. CIV. P. 23.

176.    GMS's conduct violates the PMWA (43 PA. STAT. §§ 333.101, *et seq.*).

177.    At all relevant times, GMS was subject to the PMWA because GMS was (and is) an "employer" within the meaning of the PMWA. *See* 43 PA. STAT. § 333.103(g).

178.    At all relevant times, GMS employed each Pennsylvania Class Member as its covered "employees" within the meaning of the PMWA. *See* 43 PA. STAT. § 333.103(h).

179.    The PMWA requires employers, like GMS, to pay non-exempt employees, including Bolyard and the other Pennsylvania Class Members, overtime at rates not less than 1.5 times their regular rates of pay for all hours worked in excess of 40 in a workweek. 43 PA. STAT. § 333.104(c); *see* 34 PA. CODE §§ 231.41-43.

180.    By imposing its illegal pre/post shift off the clock policy on Bolyard and the other Pennsylvania Class Members, GMS violated 43 PA. STAT. § 333.104(c) and/or 34 PA. CODE §§ 231.41-43.

181.    Specifically, GMS violated, and is violating, the PMWA by employing non-exempt employees (Bolyard and the other Pennsylvania Class Members) for workweeks in excess of 40 hours without paying them overtime at rates not less than 1.5 times their regular rates of pay for all hours worked in excess of 40 in a workweek. *See* 43 PA. STAT. § 333.104(c); *see also* 34 PA. CODE §§ 231.41-43.

182.    GMS's unlawful conduct harmed Bolyard and the other Pennsylvania Class Members by depriving them of the overtime wages they are owed.

183.     Accordingly, GMS owes Bolyard and the other Pennsylvania Class Members the difference between the rate actually paid and the proper overtime rate plus prejudgment interest and all available penalty wages. *See* 43 PA. STAT. § 333.113.

184.     Finally, Bolyard and the other Pennsylvania Class Members are entitled to recover their reasonable attorney's fees and costs incurred in this action. *See* 43 PA. STAT. § 333.113.

## COUNT III
### FAILURE TO PAY EARNED WAGES UNDER THE WPCL
### (PENNSYLVANIA CLASS)

185.     Bolyard incorporates all other paragraphs by reference.

186.     Bolyard brings his WPCL claim as a class action on behalf of himself and the other Pennsylvania Class Members pursuant to FED. R. CIV. P. 23.

187.     GMS's conduct violates the WPCL (43 PA. STAT. §§ 260.1, *et seq.*).

188.     At all relevant times, GMS was subject to the WPCL because GMS was (and is) an "employer" within the meaning of the WPCL. *See* 43 PA. STAT. § 260.2a.

189.     At all relevant times, GMS employed Bolyard and each Pennsylvania Class Member as its covered "employees" within the meaning of the WPCL.

190.     The WPCL requires employers, like GMS, to pay employees, including Lagard and the other Pennsylvania Class Members, all wages (including overtime) earned, due, and owing to them on their regular payday(s) and following the termination of their employment. 43 PA. STAT. §§ 260.3 and 260.5.

191.     GMS violated, and is violating, the WPCL by depriving its Pennsylvania Class Members of the overtime wages earned, due, and owing to them on their regular paydays and/or following the termination of their employment. *See* 43 PA. STAT. §§ 260.3 and 260.5.

192.    Bolyard's and the other Pennsylvania Class Members' earned wages have remained unpaid for more than 30 days from the date they were earned, due, and payable.

193.    GMS's unlawful conduct harmed Bolyard and the other Pennsylvania Class Members by depriving them of the earned wages they are owed.

194.    GMS's failure to pay Bolyard and the other Pennsylvania Class Members earned wages was not the result of a *bona fide* dispute.

195.    Rather, GMS knowingly failed to pay earned wages to Bolyard and the other Pennsylvania Class Members.

196.    Accordingly, GMS owes Bolyard and the other Pennsylvania Class Members their unpaid earned wages plus prejudgment interest and all available penalty wages. *See* 43 PA. STAT. § 260.9a.

197.    GMS also owes Bolyard and the other Pennsylvania Class Members liquidated damages in an amount equal to 25% of their unpaid wages. *See* 43 PA. STAT. § 260.10.

198.    Finally, Bolyard and the other Pennsylvania Class Members are entitled to recover their reasonable attorney's fees and costs incurred in this action. *See* 43 PA. STAT. § 260.9a(f).

## JURY DEMAND

199.    Bolyard demands a trial by jury on all Counts.

## RELIEF SOUGHT

WHEREFORE, Bolyard, individually and on behalf of the other Miners, seeks the following relief:

    a.    An Order designating this lawsuit as a collective action and authorizing notice pursuant to 29 U.S.C. § 216(b) be sent to the Miners allowing them to join this action by filing a written notice of consent;

b.      An Order designating the Pennsylvania Class as a class action pursuant to FED. R. CIV. P. 23;

c.      An Order appointing Bolyard and his counsel to represent the interests of the FLSA Collective and Pennsylvania Class;

d.      An Order finding GMS liable to Bolyard and the other Pennsylvania Class Members for unpaid overtime wages owed under the PMWA plus all available penalty wages;

e.      An Order finding GMS liable to Bolyard and the other Pennsylvania Class Members for unpaid earned wages owed under the WPCL plus liquidated damages in an amount equal to 25% of their unpaid wages;

f.      A Judgment against GMS awarding Bolyard and the Miners all their unpaid wages, liquidated damages, statutory damages, and any other penalties available under the FLSA, PMWA, and WPCL;

g.      An Order awarding attorney's fees, costs, and expenses;

h.      Pre- and post-judgment interest at the highest applicable rates; and

i.      Such other and further relief as may be necessary and appropriate.

Respectfully submitted,

**GOODRICH & GEIST, PC**

By: */s/ Joshua P. Geist*
Joshua P. Geist, Esquire
PA ID No. 85745
William F. Goodrich, Esquire
PA ID No. 30235
3634 California Ave.
Pittsburgh, Pennsylvania 15212
Tel: (412) 766-1455
Fax: (412) 766-0300
josh@goodrichandgeist.com
bill@goodrichandgeist.com

Michael A. Josephson, Esquire
PA ID No. 308410
Andrew W. Dunlap, Esquire*
TX Bar No. 24078444
**JOSEPHSON DUNLAP LLP**
11 Greenway Plaza, Suite 3050
Houston, Texas 77046
Tel: (713) 352-1100
Fax: (713) 352-3300
mjosephson@mybackwages.com
adunlap@mybackwages.com

Richard J. (Rex) Burch, Esquire*
TX Bar No. 24001807
**BRUCKNER BURCH PLLC**
11 Greenway Plaza, Suite 3025
Houston, Texas 77046
Tel: (713) 877-8788
Fax: (713) 877-8065
rburch@brucknerburch.com

*Pro hac vice applications forthcoming*

**ATTORNEYS FOR BOLYARD AND
THE MINERS**

24